**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | Case No. 4:17-cv-00059 |
| **BRIAN S. HUDNALL and JBH CONSULTING GROUP LLC,** | ) ) ) | |
| **Defendants.** | ) ) | |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("Commission" or "SEC"), as and for its Complaint against Defendants Brian S. Hudnall and JBH Consulting Group LLC, alleges:

## SUMMARY

1.      From September 2008 through at least June 2014, Defendants JBH Consulting Group LLC ("JBH") and Brian S. Hudnall, JBH's President and CEO, made materially false and misleading statements to potential investors in order to sell securities in numerous oil and gas offerings.  None of the securities offerings – or purported "joint ventures," as Defendants labeled them—were registered with the SEC.  And none of the individuals working for JBH to sell the securities, including Hudnall, were licensed or associated with registered brokers.

2.      Through the false and misleading securities offerings, JBH and Hudnall raised millions of dollars from dozens of investors nationwide, with Hudnall personally receiving over $3 million for himself.

3.      To attract and retain investors, JBH and Hudnall made numerous materially

false and misleading statements and omissions in the offering documents and other written communications they sent to prospective and existing investors, including by:

- falsely representing that title to "joint venture" assets would be held by the "joint ventures";

- misrepresenting the costs of the offerings and how Defendants would use investor funds;

- hiding substantial (30-50%) markups Defendants charged to investors;

- understating the amount of working interest in the wells Defendants retained for themselves; and

- failing to disclose discounts and other favorable side deals made with certain investors, some of whom were Defendants friends and relatives.

4. The SEC brings this civil enforcement action seeking permanent injunctions, disgorgement plus pre- and post-judgment interest, and civil penalties for Defendants' violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)], and Sections 10(b), 15(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78o(a) and 78t(a)], and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## JURISDICTION AND VENUE

5. The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. The Commission seeks the imposition of civil penalties pursuant to Section 20(d)(2)(C) of the Securities Act [15 U.S.C. § 77t(d)(2)(C)] and Section 21(d)(3)(B)(iii) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)(B)(iii)].

6. The Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21 and 27 of the Exchange

2

Act [15 U.S.C. §§ 78u and 78aa] because Defendants directly and indirectly made use of the means or instrumentalities of interstate commerce and the mails in connection with the transactions described herein.

7.    Venue is proper in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Defendants reside and transact business in this District, and the acts and transactions constituting the securities violations described herein occurred in this District.

**DEFENDANTS**

8.    JBH is a Missouri limited liability company headquartered in Liberty, Clay County, Missouri.  It was incorporated by Hudnall in June 2007.  JBH has never been registered with the Commission, nor has it ever registered any offering of securities under the Securities Act or any class of securities under the Exchange Act.

9.    Brian S. Hudnall, age 39, is a resident of Liberty, Clay County, Missouri. Hudnall is, and was at all times relevant to the events described herein, the owner, managing member, and CEO of JBH.  Prior to incorporating JBH, Hudnall sold securities for other oil and gas businesses.

**FACTS**

A.    **SUMMARY OF DEFENDANTS' OIL AND GAS INVESTMENT PROGRAMS**

10.    From September 2008 until at least 2014, JBH and Hudnall offered and sold securities in at least 20 investment programs, raising over $16 million, created for the purpose of acquiring interests in oil and gas wells ("prospect wells") that were drilled and operated by third parties in Kansas and Texas.

11.    Hudnall and JBH solicited investors by purchasing lead lists or customer lists

3

from third parties and then directing JBH employees to make cold calls to potential investors. Hudnall also directly solicited investors, including by telephone, in person, and by email. After the initial sales call, Defendants sent written offering materials to interested prospects.

12.     JBH paid sales commissions, ranging from 15 to 20%, to employees for soliciting investors. Hudnall also received commissions on sales of the oil and gas securities offerings.

13.     Although Defendants labeled their investment programs as "joint ventures," the investments were and are "securities" under the federal securities laws. Investors in each of Defendants' oil and gas offerings made an investment of money, in a common enterprise, with an expectation of profits derived from the efforts of others. Moreover, investors in Defendants' oil and gas offerings received a certificate of interest or participation in a profit-sharing agreement.

14.     According to Defendants' offering materials, each "joint venture" would purchase from a well operator a certain percentage of the "working interest," and corresponding "net revenue interest" (*i.e.*, the percentage of the oil and gas production profits) in one to four prospect wells. Investors were offered the opportunity to purchase "Units" in the "joint venture," with each Unit entitling the investor to a certain percentage of the working interest (most often about 2.68%) and corresponding net revenue interest (most often about 2.26%) from the wells in the offering. Defendants' offering materials generally stated that each investor would share in the costs and revenues of the "joint venture" in proportion to the Units they owned. The offering materials also stated that JBH would serve as the managing venturer of each purported "joint venture."

15.     The following chart contains a list of 18 separate oil and gas "joint ventures" created by Defendants. The chart includes: (a) the name of each offering, (b) the date of the

4

offering documents, (c) the offering amount, (d) the amount of investor money raised by Defendants for each offering, and (e) the amounts paid out to investors ("Cumulative Revenues") as of September 9, 2014.

| Offering | Date on Offering Documents | Offering Amount | Amount Raised | Cumulative Revenues as of 9/2014 |
|---|---|---|---|---|
| JBH Dean Project | 9/15/08 | $3,000,000 | $254,000 | $43,378 |
| JBH Spanish Fort Project | 3/20/09 | $3,100,000 | $502,770 | $390,317 |
| JBH Kansas JV III | 6/21/10 | $1,400,000 | $620,455 | $0 |
| JBH Kansas JV IV | 1/15/ 11 | $2,800,000 | $1,584,249 | $254,804 |
| JBH Texas JV V | 2/25/11 | $3,900,000 | $130,000 | $0 |
| JBH Kansas JV VII | 9/26/11 | $3,000,000 | $1,491,742 | $544,053 |
| JBH Kansas JV VIII | 12/9/11 | $3,000,000 | $911,359 | $191,656 |
| JBH Kansas JV IX | 12/19/11 | $3,000,000 | $1,106,427 | $667,770 |
| JBH Kansas JV X | 12/19/11 | $3,000,000 | $1,074,291 | $540,971 |
| JBH Kansas JV XI | 3/13/12 | $750,000 | $516,059 | $418,228 |
| JBH Texas JV XII | 4/20/12 | $875,000 | $173,469 | $2,134 |
| JBH Kansas JV XIII | 8/15/12 | $3,000,000 | $987,486 | $406,748 |
| JBH Kansas JV XIV | 10/29/12 | $750,000 | $430,450 | $0 |
| JBH Kansas JV XV | 2/15/13 | $3,200,000 | $1,096,900 | $0 |
| JBH Kansas JV XVI | 2/15/13 | $3,200,000 | $1,131,000 | $20,705 |
| JBH Texas JV XVII | 5/15/13 | $2,250,000 | $511,843 | $0 |
| JBH Kansas JV XVIII | 7/15/13 | $750,000 | $414,040 | $73,010 |
| JBH Kansas JV XIX | 6/15/13 | $3,200,000 | $1,090,400 | $65,329 |
| **TOTAL** | | | **$14,026,940** | **$3,619,103** |

16.     Defendants raised more than $14 million from over 80 different investors in the 18 offerings described above.

17.     Defendants' offering documents state that participation in the "joint ventures" was limited to accredited investors; however, Hudnall admits non-accredited investors were allowed to participate in some "joint ventures."

**B.     DEFENDANTS' OFFERING MATERIALS**

18.     Defendants offered and sold "Units" in their oil and gas "joint ventures" using written offering materials. From 2008 until June 2014, the offering materials remained

substantially the same and included a Confidential Information Memorandum ("CIM"), a "Prospect Information Package" or "Program Summary," a "Joint Venture Agreement," an "Investor Questionnaire," and an "Application Agreement." Defendants, through Hudnall, helped draft these documents, made the final decisions regarding the information included in each document, and were responsible for updating the documents with current information. At all times, Defendants held and exercised ultimate authority over the statements contained and omitted from each document.

19.     Defendants' offering documents made representations regarding the number of wells in the offering, the amount of interest the purported "joint venture" would obtain in each well, the use of funds, and the structure of the investments. For each new offering, Defendants typically altered only the description or number of wells, the total offering amount, the percentage of the working interests the alleged "joint venture" intended to obtain, the percentage interest offered to investors, and other similar details.

C.     **DEFENDANTS MADE NUMEROUS MATERIAL MISREPRESENTATIONS AND OMISSIONS IN CONNECTION WITH THE OFFERINGS.**

20.     The offering materials and other communications Defendants used to sell interests in the offerings contained numerous materially false and misleading statements and omissions.

        1.     Title To The Working Interests

21.     JBH purchased the working interests in the prospect wells by executing agreements with the well operators. Defendants CIMs and Program Summaries given to investors stated that the "joint venture" intended to acquire a certain percentage of the working interests and corresponding net revenue interests in one to four prospect wells. The CIMs stated that title to "joint venture" property would be held in the name of the "joint venture," except that

title could be held temporarily in the names of nominees in order to facilitate acquisition of the property by the "joint venture" and that JBH "will use its best efforts to have title transferred to the Venture as soon as is practicable upon Completion of the Prospect Well."

22.     These representations were false.  JBH, not the "joint ventures," purchased the working interests from the well operator and never transferred title to the "joint ventures." Instead, JBH retained ownership of all working interests and corresponding revenue interests in the prospect wells.  JBH and not the "joint ventures," therefore, was entitled to receive all net revenues generated from the prospect wells.

23.     This was significant because, as a result of the failure to transfer title, the "joint ventures" and their respective investors had no control over operations and no rights against the operator to the revenue from any specific wells.

24.     In addition to promising that title to "joint venture" property would be held by the "joint venture," the CIMs also stated that JBH intended to own only between 1-3% of the working interest, depending on the venture, in each prospect well.  This statement was false because, as a result of JBH keeping all the working interest, it owned substantially more than 1-3% of the working interest in the wells.  Despite the language in the CIMs, Defendants never intended for JBH to own only a 1-3% working interest in the wells.

2.     Costs Of The Offerings And Use Of Investor Proceeds

25.     Defendants substantially marked-up the stated costs of each "joint venture" offering in order to increase their own profits.  Without disclosing the markups, Defendants misled investors by claiming that the drilling and well completion costs for each "joint venture" would be anywhere from 30-50% higher than what Defendants truly believed they would be. Defendants kept the difference between the marked-up costs, which investors paid, and the actual costs as undisclosed profits.

7

26.     Defendants knew the approximate actual cost to drill, test, and complete a well,

which the CIM defined as "initial operations."  The operator who sold the majority of the

working interests to JBH told Hudnall on that the estimated cost of initial operations was

approximately $365,000 to $425,000 for 100% of the working interests in a well (*i.e.*, 1% of the

working interests in a prospect well was about $3,650 to $4,250 for drilling, testing and

completion).  Defendants, however, typically charged investors nearly $10,000 per 1% working

interest in a well.

27.     For example, Defendants' CIM for JV VII represented that JBH sought to

raise $3,000,000 from investors.  It further claimed that the $3,000,000 offering amount

"includes $2,200,000 for the Venture's share of the anticipated costs for drilling the Prospect

Wells and $800,000 for the Venture's share of the anticipated costs for completion of the

Prospect Wells."  The CIM also represented that JBH would collect no management fee for

this "joint venture."

28.     The CIM for JV VII included the following chart describing the expected

expenditure of investor funds on initial operations:

| ESTIMATED EXPENDITURES OF VENTURE FUNDS | | |
|---|---|---|
| **Drilling and Completion Prices**[(1)] | $2,200,000[(2)] | $800,000[(2)] |
| **Organizational Costs**[(3)] | -0- | -0- |
| **Managing Venturer's Management Fee** | -0- | -0- |
| **TOTAL** | **$2,200,000** | **$800,000** |

(1) The Drilling and Completion Prices will depend on the terms of the Drilling Contract and the Completion
Contract.

(2) The Initial Capitalization of $3,000,000 includes $2,200,000 for the Venture's share of the anticipated initial

costs for drilling the Prospect Wells and $800,000 for the Venture's share of the anticipated costs for the completion of the Prospect Wells.

(3) The Organizational Costs are being paid by JBH Consulting without charge to the Venture.

29.     Defendants' representations were materially false and misleading.  The actual drilling and completion costs for JV VII were approximately 30-50% less than what Defendants represented to investors.  Defendants knew from prior communications with the operator, as well as from their experience with prior projects, that the true costs would be much lower.

30.     By inflating the estimated costs of the "joint venture," Defendants were able to pay themselves substantial fees without telling investors.   For example, although the CIM for JV VII states that JBH would receive no management fee on that offering, Hudnall took for himself approximately 15-20% of every investment as his undisclosed commission. Defendants also gave JBH sales employees a 15-20% commission for each sale they closed.

31.     The CIMs for the other offerings contained similar misrepresentations regarding the estimated costs and expenditure of investor funds.  Generally, the CIMs represented that at least 80% of the money raised from investors would be spent on initial operations.  Eleven of the CIMs for "joint ventures" JV III through JV XIX represented that JBH would be paid no management fee; while other CIMs stated that JBH would receive a specific amount as its management fee.  In reality, the amounts Defendants spent on initial operations costs and the amounts Defendants took as fees and commissions were much different than they represented.

32.      The following chart shows Defendants' actual average use of investor funds. The figures in the following chart are based on information provided by Defendants' accountant, bank statements, and billing statements from the operator of the wells.

9

| Average Use of Proceeds | |
|---|---|
| Drilling, Testing, and Completion | 35-50% |
| JBH Profit and Overhead | 20-30% |
| Commissions to Sales Employees | 15-20% |
| Payments to Hudnall | 15-20% |

33.     Similarly, even though Defendants represented in the CIMs that a certain percentage of their investment money would be spent on completion costs, some "joint ventures" incurred little or no completion costs because one or more of the wells in the offering turned out to be dry holes.

34.     If a well was dry, JBH generally spent no money to complete it.  JBH kept the unspent money instead of returning it to investors.

35.     Defendants did not tell investors they were taking the unspent completion costs for themselves. For example, in JV III, JV V, JV XIV, and JV XV, none of the wells in the joint ventures were completed, yet none of the completion costs were returned to investors.  Moreover, each of the ventures with more than one well had at least one well where no completion costs were spent.

3.     Operator's Carried Working Interest

36.     As part of the compensation for operating a well, JBH agreed to provide the operators, at no cost, a certain percentage of the working interest in each well.  However, JBH was not required to provide the working interest to the operator until "payout."  Payout occurs when the revenues generated from the well equal the costs of the well.  This arrangement was set forth in an agreement between JBH and the operators.

37. Although Defendants disclosed in the CIMs that a certain percentage of working interest in each well would be provided to the operator, they did not tell investors — in the offering documents or otherwise — that the operator's working interest only became effective at payout or that Hudnall kept for himself the pre-payout revenue associated with the operator's carried working interest. Moreover, Defendants used investor funds to pay the costs associated with operator's carried working interest prior to payout.

38. For instance, if JBH purchased 37.5% of the working interest in a well, Defendants were required to return 9.375% (*i.e.*, one-fourth) of the working interest to the operator at payout. In addition, the operator's working interest was considered a carried working interest because the operator did not have to pay the costs associated with the working interest.

39. In the CIMs, Defendants included a chart outlining the interest allocations that noted that the well operator would receive a "CWI," although this term was not defined in the CIMs. The CIMs defined only the term "carried working interest," as a working interest where the associated costs would be paid for by "a party other than" the operator. The CMIs and Defendants failed to disclose, however, that the other "party" was the investors.

40. Defendants' CIMs misleadingly stated that each investor would be responsible only for his or her proportional share of the costs of the "joint venture" (and would be entitled to his or her proportional share of the net revenues). That is, according to Hudnall, if an investor purchases Units equivalent to 14.29% of the "joint venture," "the percentage of costs they'd have to pay" is 14.29%.

41. Defendants, however, did not apportion costs as they said they would. Each month, the well operator sent invoices to JBH seeking payment of the initial operations costs

associated with the total working interests acquired by JBH in each well. Defendants used investor funds to pay for all the costs, including the costs for the operator's carried working interest.

42.     To further conceal from investors the true proportion of initial operations costs they had paid, Defendants sent investors misleading monthly operating statements once wells began producing. Defendants' monthly operating statements represented that each investor was paying costs equivalent to the percentage of working interests allocated to that investor, which further misled investors into believing they had been paying the same percentage of costs for initial operations.

4.     Undisclosed Sales Of Working Interests In Producing Wells

43.     In addition to using investor money to pay for the operator's carried working interest, Defendants used investor funds to pay the costs associated with working interests sold to third parties after wells began producing. As with the operator's working interest, Defendants kept the eventual sale proceeds, even though investors paid all the costs.

44.     For example, in JV IX, JBH purchased from the operator a 37.5% working interest in two wells, and a 60% working interest in the other two wells. Defendants initially sold to investors Units equivalent to approximately 22% working interests in each of the four wells. According to the CIM for JV IX and Hudnall, that meant investors in JV IX should have paid only the costs associated with the 22% working interests in each well and not the costs associated with the remaining unsold working interests.

45.     Defendants, however, used investor funds to pay the drilling, testing, and completion costs associated with all the working interests purchased by JBH, including the 15.5% unsold working interests in each of the first two wells and the 38% unsold working interests in each of the last two wells.

12

46. Defendants were able to use investor funds to pay for the costs affiliated with the unsold working interests because of the hefty markups Defendants charged investors as part of their original investments. Defendants never disclosed to investors that they were paying the costs for the unsold working interests.

47. When the wells began producing, Defendants sold some of the previously unsold working interest. For example, in JV IX, when one of the wells in which JBH originally purchased 37.5% of the working interests began producing, Defendants sold approximately 6% of the remaining (15.5%) unsold working interest to new investors. For example, one new investor paid $4,200 for 1% of the working interests, whereas the other investors paid approximately $26,000 for 1% of the working interests. Because all expenses associated with this 6% working interest had been paid by the other investors, Defendants kept the sale proceeds as an undisclosed additional profit. That left a 9.5% working interest in the well, which was the operator's carried working interest.

48. Defendants followed similar practices in connection with other "joint ventures" containing wells that produced oil, including JV IV, JV VII, JV VIII, JV IX, JV X, JV XVI, and JV XVIII.

### 5. Defendants' Working Interest

49. In the CIMs, Defendants represented that JBH, the "managing venturer" for each "joint venture," intended to own between 1% and 3% working interest (depending on the specific "joint venture"). This representation was false because, as noted above, JBH (not the "joint venture") retained ownership of all working interests.

50. Defendants' CIMs also stated that JBH could purchase units in the "joint venture" at the same price offered to investors, or that Defendants could purchase additional

working interests outside the "joint venture" as an industry participant. But that is not what Defendants did. Instead, they acquired additional working interests without paying for them.

### 6. Other Undisclosed Profits.

51.     As a result of the undisclosed working interest schemes, Defendants were able to substantially increase their own revenues while reducing the likelihood that their investors would make a profit.

52.     In one example, JBH purchased varying working interests in the four wells in JV VII, ranging from 37.5% to 82.5%. In the well for which JBH owned 82.5% of the working interests, the investors in JV VII were allocated only 43.17%. Defendants charged initial investors $40,000 per 1% working interest. Defendants distributed the remaining working interests to themselves, JBH sales employees, and other select individuals.

53.     Defendants used investor funds to pay for everything, including the purchase price and drilling, testing and completion costs for the near 40% working interests Defendants kept for themselves, their employees, and other individuals. When the well began producing, Defendants sold additional working interests at a rate of $4,200 per 1% working interest, keeping the sales proceeds for themselves.

54.     The breakdown of the working interests and net revenue interests in the well, according to information provided by Defendants' accountant, was as follows:

| JV VII Well | | |
|---|---|---|
| | Working Interest | Net Revenue Interest |
| JV VII | 43.17% | 36.25% |
| JBH | 13.68% | 10.32% |
| Hudnall | 11.91% | 9.77% |
| CWI for Sales Employees and References | 7.52% | 6.17% |

14

| Sales of Production | 6.2% | 5.09% |
|---|---|---|
| **TOTAL** | **82.5%** | **67.6%** |

55.      In sum, JV VII was assigned only 43.17% of the working interests in this well compared to 39.31% assigned to JBH, Hudnall, and others.  Even though JV VII was allocated only 43.17% of the working interests, Defendants made JV VII investors pay all the costs.  And despite paying none of the costs, Defendants and their employees received over 20% of the net revenue generated by the well.  JBH and Hudnall never disclosed this breakdown of working and net revenue interests to investors.

56.      Defendants employed similar practices for the other "joint ventures."  From January 2011 to August 2014, the well operators paid JBH over $4.3 million in revenue from the sales of oil in the wells, but Defendants paid only approximately $3.3 million to investors.  After paying approximately $50,000 to JBH employees, Defendants kept the rest for themselves.

### 7.      Other Misleading Statements And Omissions

57.      In addition to the false and misleading representations described above, Defendants deceived investors in other ways as well.

58.      Defendants let a select group of friends and relatives into the "joint ventures" at discounted prices not available to other investors.  Although the CIMs stated that a 10% discount would be provided to investors purchasing five or more Units, Defendants provided some individuals with discounts larger than 10%.

59.      For example, Hudnall allowed friends to invest at cost per 1% working interest in several joint ventures, including JV XI, JV XII, JV XX, and JV XV.  That was approximately a 50-75% discount off the price paid by other investors.  In JV XI, Hudnall's friend paid $4,200

for 1% working interest, whereas the other investors paid $8,753.50 per 1% working interest. In JV XX, Hudnall's friend paid $11,200 for a 1% working interest, whereas the other investors were charged $42,666 for a 1% working interest. Similarly, in JV XII, Hudnall charged one investor only $82,707.75 for a 9% working interest, whereas two others paid $70,000 for a 5% working interest.

60.    Moreover, to induce investments, Defendants provided potential investors the names of earlier investors as references, who then touted the investments and JBH. Defendants compensated the touters through cash payments, special deals, and additional working interests.

61.    As a result of Defendants' actions, investors in the "joint ventures" were treated disparately. They received different amounts of working and corresponding net revenue interests despite investing the same amounts. Defendants did not disclose the preferential treatments certain investors received to the other investors. The result was that certain investors bore greater responsibility for costs.

**D.    Investments in Defendants' Offerings Are Securities.**

62.    Section 3(a)(10) defines a "security" to include any "certificate of interest or participation in any profit-sharing agreement." Each investor received Units in the venture representing a certain percentage working interest in oil and gas wells, including the right to receive a certain percentage of the net revenue from well production. Each Unit or working interest equivalent is an interest or participation in a profit-sharing agreement.

63.    Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define the term "security" to include an "investment contract." The investments in Defendants' offerings are investment contracts because investors (a) invested money (b) in specified oil and gas drilling programs (c) and were led to expect profits (d) derived from the efforts of

16

Defendants and others.

64.     Although Defendants referred to their oil and gas investment offerings as "joint ventures," and the Joint Venture Agreements purported to create general partnerships, the powers provided for by the Joint Venture Agreements were illusory.  Defendants did not let investors participate in the management of or in any decisions relating to the "joint ventures."

65.     For at least the 18 offerings identified in paragraph 15, Defendants controlled every aspect of the "joint ventures'" operations and made all decisions.  Hudnall selected the project and operator and determined the offering amount for each "joint venture."  Per the Joint Venture Agreements, JBH controlled who was admitted to the "joint venture."  Hudnall decided, without input from investors, whether to substitute new wells for the ones described in the offering documents, and whether to complete or plug wells.

66.     Defendants never distributed a ballot to investors or otherwise sought their vote on any decision related to the "joint ventures" identified above in paragraph 15 or their operation.  Investors were completely dependent upon Defendants for the management, operation and success of the "joint ventures."

## CLAIMS FOR RELIEF

### First Claim
### Section 10(b) of the Exchange Act and Rule l0b-5
### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

67.     Plaintiff repeats and incorporates by reference paragraphs  1 through 66 of this Complaint as if set forth herein.

68.     Defendants, by engaging in the conduct described above, directly and indirectly, with *scienter,* in connection with the purchase or sale of securities, and by use of the means and instrumentalities of interstate commerce the mails, or any facility of a national

17

securities exchange, have: (a) employed devices, schemes and artifices to defraud; or (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business that have operated or will operate as a fraud and deceit upon other persons.

69.     By reason of the foregoing acts and practices, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

Second Claim
Section 17(a)(1) of the Securities Act
[l5 U.S.C. § 77q(a)]

70.     Plaintiff repeats and incorporates by reference paragraphs 1 through 66 of this Complaint as if set forth herein.

71.     Defendants directly or indirectly, in the offer or sale of securities, and by use of the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange, have employed devices, schemes, and artifices to defraud.

72.     Defendants acted knowingly or with severe recklessness.

73.     For these reasons, Defendants have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

Third Claim
Section 17(a)(2) and (a)(3) of the Securities Act
[ l5 U.S.C. § 77q(a)(2) and (a)(3)]

74.     Plaintiff repeats and incorporates by reference paragraphs 1 through 66 of this Complaint as if set forth herein.

75.     Defendants directly or indirectly, in the offer or sale of securities, and by use of

the means and instrumentalities of interstate commerce or the mails, or any facility of a national securities exchange, have obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

76.     Defendants were at least negligent in their actions regarding the representations and omissions alleged herein.

77.     For these reasons, Defendants have violated and, unless enjoined, will continue to violate Section 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (a)(3)].

**Fourth Claim**
Section 5(a) and 5(c) of Securities Act
[15 U.S.C. §§77e(a) and 77e(c)]

78.     Plaintiff repeats and incorporates by reference paragraphs 1 through 66 of this Complaint as if set forth herein

79.     Defendants directly or indirectly have made use of the means of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the SEC as to such securities, and have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no registration statement had been filed with the SEC as to such securities.

80.     There were no applicable exemptions from registration, and Defendants therefore violated, and unless restrained and enjoined will in the future violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

Violations of Exchange Act Section 15(a)
[15 U.S.C. § 78o(a)]

81.     Plaintiff repeats and incorporates by reference paragraphs l through 66 of this Complaint as if set forth herein.

82.     Defendants, while engaged in the business of effecting transactions in securities for the account of others, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act.  Defendants do not qualify for any exemption to the registration requirements of Section 15(a).

83.     Defendants violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

Sixth Claim
Section 20(a) of the Exchange Act
[20(a) (15 U.S.C. § 78t(a))]

84.     Plaintiff repeats and incorporates by reference paragraphs l through 66 of this Complaint as if set forth herein.

85.     At all times, Hudnall possessed the power to direct or cause the direction of the management and policies of Defendant JBH.  Hudnall participated in the daily affairs of JBH. He possessed the power to control JBH's corporate actions, and he exercised that power by causing JBH to engage in all the acts and omissions alleged in this Complaint.

86.     Hudnall is a "control person" of JBH pursuant to Section 20(a) of the Exchange Act.  [15 U.S.C. § 78t(a)]

87.     As JBH's control person, Hudnall is liable for JBH's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)    Enter an Order finding that Defendants committed, and unless restrained will continue to commit, the violations alleged in this Complaint;

(2)    Permanently enjoin Defendants from future violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

(3)    Permanently enjoin Defendants from future violations of Section 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)];

(4)    Permanently enjoin Defendants from future violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(5)    Order Defendants to disgorge all ill-gotten gains from the conduct alleged herein, with prejudgment interest;

(6)    Order civil penalties against Defendants pursuant to Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1] and Section 20(d) of the Exchange Act [15 U.S.C. § 77t(d)] for violations of the federal securities laws as alleged herein; and

(7)    Order such other and further relief as the Court may deem just and proper.

Dated: January 27, 2017                    Respectfully submitted,

                                    By:    /s/Daniel J. Hayes
                                           Daniel J. Hayes (IL Bar No. 6243089)
                                           Aleah Borghard (NY Bar No. 4595054)
                                           U.S. Securities and Exchange Commission
                                           Chicago Regional Office
                                           175 W. Jackson Blvd., Suite 900
                                           Chicago, Illinois 60604
                                           (312) 353-3370

21